## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ROXANA WALKER-CANTON,
    Plaintiff                 :

Vs.                         :     C.A. NO.

FAIRFIELD UNIVERSITY,    :
    Defendants           :     SEPTEMBER 15, 2014

## COMPLAINT

### INTRODUCTION

1. This is an action for money damages, costs, attorney's fees, and other relief as a result of Defendant's breach of contract and discriminatory conduct undertaken against Plaintiff on the basis of her race and gender in violation of federal and state law.

2. Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et seq.* ("CFEPA"), and the common law of the State of Connecticut.

### JURISDICTION

3. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it presents a federal question under 42 U.S.C. § 2000e *et seq.*

4. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. §1367.

5. Plaintiff dual filed her claims with the Connecticut Commission on Human Rights and Opportunities ("CCHRO") and Equal Employment Opportunity Commission ("EEOC") on October 17, 2013.

6. Plaintiff received a release of jurisdiction from the CHRO on or about June 25, 2014 and the EEOC on or about June 26, 2014.

## PARTIES

7. Plaintiff, Roxana Walker-Canton, is an African American female. Plaintiff presently resides in Hamden, Connecticut. At all times relevant to this Complaint, Plaintiff was an employee of Defendant.

8. Defendant, Fairfield University, is a Connecticut Non-Stock Corporation. Defendant is an employer within the meaning of, and subject to the provisions of, Title VII and CFEPA.

## BACKGROUND

9. At all times hereinafter relevant, the Plaintiff was a qualified and experienced Professor and filmmaker. The plaintiff earned her B.A. degree, *magna cum laude*, from Spelman College in 1991 in French and Spanish, Master's Degree in Black Studies in 1994 and a Masters in Fine Arts Degree in English in 1994. The Plaintiff also received a Masters in Fine Arts in Film and Media Arts from Temple University in 1999.

10. Before working for the Defendant, Plaintiff was a Part-time Assistant Professor of Gender & Women's Studies & Film Studies at Connecticut College from 2004 to 2008.

2

11. Plaintiff has received numerous grants for her work.  She recently received an Artist Fellowship Grant from the CT Commission on Culture & Tourism and a National Council for Black Studies Cutting Edge Gender Research Grant.

12. Plaintiff has numerous scholarly activities that were subjected to peer review. Plaintiff was the co-author of a successful Humanities Institute to advance a new student group called "Reel Woman," which brought film makers and scholars to campus to get women in the Department of Visual and Performing Arts to think about gender in the field of film.  Plaintiff also completed a documentary film entitled, *Belly of the Basin*, about post-Katrina New Orleans, which was screened at juried film festivals; *Living Thinkers: An Autobiography of a Community of Women*, which Plaintiff presented a paper on at the 9th International Conference of the Collegium of African American Research.

13. Plaintiff was actively of service to the academic community at Fairfield University through mentorship of students, involvement in the 5-year review of the Film, Television & Media Arts Program, and election to a three-year term on Defendant's Curriculum Committee.

14. Plaintiff commenced her employment with Defendant in 2008.  The plaintiff was appointed to full time faculty in a tenure track position as an Assistant Professor in the Film, Television & Media Arts Program (formerly known as the New Media Program) of the Department of Visual and Performing Arts housed within the College of Arts & Sciences.  At all relevant times, Plaintiff has professionally, competently, and diligently performed her job duties as an employee of Defendant.

15. Plaintiff's employment as an assistant professor on tenure track was governed by oral and written communications between Plaintiff and Defendant as well as circumstances and academic customs or usage that served to define the terms and conditions of the employment agreement leading to tenure.

16. Plaintiff received an offer letter for the position of Assistant Professor of Visual & Performing arts letter dated February 12, 2008 (hereinafter the "position offer letter"). The offer letter established that Plaintiff was offered a one-year renewable contract that "will be counted as normal experience toward tenure." Furthermore, the Plaintiff was given one year of credit for prior service in the academic profession which would shorten the maximum probationary period before tenure. The position offer letter instructed Plaintiff that, "you must apply for tenure review in the 2012-2013 academic year, your fifth year here." The position offer letter did not establish procedures for the review or tenure process.

17. Plaintiff was also presented with a "Faculty Contract" dated May 31, 2008 (hereinafter the "2008 Faculty Contract") signed by Plaintiff and Jeffrey P. von Arx, President of Fairfield University. According to the 2008 Faculty Contract, the position offered to Plaintiff was Assistant Professor Visual & Performing Arts. The Faculty Contract did not established procedures for the review or tenure process. However the 7th clause stated that:

> This contract shall be renewed upon the same or better terms and conditions unless either party shall give notification of the intention to terminate it according to the requirements for such notification set down in the official statement of the University on this matter and with due regard for the rights of tenures faculty members.

4

18. Thereafter, Plaintiff continued to receive annual "Faculty Contracts" through the date of the tenure decision at the end of the probationary period.

19. The probationary period, also referred to as the tenure track, is an appointment to the faculty that is offered to allow the candidate an opportunity to demonstrate that she has met the standards and criteria for tenure that have been communicated to her at the commencement of her appointment and during annual reviews of performance.

20. Prior to and during Plaintiff's employment at Fairfield University, Defendant formally adopted and then published documents governing the process for the tenure decision and the criteria applicable to that decision.  Plaintiff reviewed and relied upon these publications when conforming her plans for publication of her scholarship during the probationary period and making adjustments to her teaching and service.  These documents included, but were not limited to, the procedures, policies, and guidelines set forth in the tenth edition of Defendant's Faculty Handbook and the Journal of Record and all communications from the Chair of Plaintiff's department and the Dean of the College of Arts & Sciences as set forth in this complaint.

21. Defendant's Faculty Handbook § II.A.3.a provides that the, "Procedure for application for tenure shall be the same as that for promotion in II.A.2.a."

22. Defendant's Faculty Handbook § II.A.2a provides the procedure for promotion as follows:

> Schools shall publish their procedures for applying for promotion. Procedures in all schools shall conform to the following guidelines: (1) schools shall define "appropriate faculty" in adequate detail in

the publication of their procedure for applying for promotion; (2) the burden of proof that the faculty member should be promoted rests with the faculty member. He/she shall supply information appropriate and sufficient to sustain the case. Appropriate faculty and the Dean shall be supplied with, and shall review, this information before writing their evaluations; the Dean should review the application and, when appropriate, make suggestions to strengthen it; (3) the application procedure shall provide for written evaluations of the applicant to be submitted by the appropriate faculty to the person responsible for the applicant's curriculum area and a separate written evaluation to be submitted by the Dean of the appropriate school to the Committee on Rank and Tenure; (4) faculty members and the Dean shall include in their evaluations a clear recommendation to grant or withhold promotions and these evaluations will become part of the candidate's Rank and Tenure file. (5) The applicant shall arrange for the submission of at least two letters from outside evaluators, who will address the quantity and quality of the applicant's scholarship. (5) The Dean shall arrange for the submission of at least three letters from external reviewers, who will address the quantity and quality of the applicant's scholarship. (*Amendment to the 10th edition, approved October 2010*)

The Rank and Tenure Committee shall review the applicant's Rank and Tenure file and decide whether to recommend promotion or not to the President and the Board of Trustees of the University.

23. Defendant's Faculty Handbook §II.A.2.a also provides that, "Upon request of any faculty member denied promotion, the Administration shall furnish written reasons for the denial to the candidate."

24. According to Defendant's Faculty Handbook §II.A.1.b.(3), the criteria for the academic rank of Associate Professor is "(a) the doctorate or other terminal degree in the appointee's field; (b) four years experience in the rank of Assistant Professor; (b) five years experience in the rank of Assistant Professor (*Amendment to the 10th edition, approved March 2006*); (c) a demonstrated record of teaching effectiveness on the college level; (d) demonstrated scholarly or creative activity that has been subjected to peer

6

review; and (e) evidence of service to the academic community, a learned

society or professional service to other organizations."

25. According to Defendant's Faculty Handbook § II.A.3.b the minimum

qualifications for recommendation to tenure are as follows.

> (1) That the Committee on Rank and Tenure find that the candidate clearly satisfies the criteria for his or her academic rank; and
>
> (2) That, because Fairfield University recognizes conspicuous success in teaching to be of paramount importance, the candidate shall have a demonstrated record of teaching effectiveness on the college level; that, because Fairfield University recognizes that its faculty are members of a scholarly community, the candidate shall have a demonstrated record of scholarly or creative accomplishments that have been subject to peer review; that the candidate shall have presented evidence of service to the academic community, a learned society or professional service to other organizations; and
>
> (3) That the candidate for tenure shall have served a probationary period of not less than five years in the academic profession, not less than two of which years shall have been served at Fairfield University. The minimum probationary period of two years served at Fairfield University shall be applicable even though the maximum probationary period hereinafter referred to shall thereby be extended. By mutual written consent of the faculty member and the University, years served in the academic profession at another institution may be omitted from the computation of the probationary period. Allowable conditions for the exclusion of prior service would be one or more of the following: the prior service was at a foreign University; the prior service was in a different discipline; there has been a significant gap in time since the prior service; the other institution was of a type which required significantly different teaching loads or had significantly different expectations of professional competence from Fairfield; the service at the other institution was prior to the receipt of the appointee's doctorate or terminal degree.

26. Defendant's Faculty Handbook § II.2. defines three areas for which "promotion to the next higher rank shall require evidence of continuing professional accomplishments which is found to be satisfactory by the Committee on Rank and tenure." Those areas are 1) teaching; 2) recognized professional competence; and 3) professional services. According to Defendant's Faculty Handbook § II.2.b.i, "Promotion to any rank shall require evidence of teaching effectiveness." Defendant does not define teaching effectiveness or provide any metrics for how teaching effectiveness will be measure or consistently assessed.

27. Defendant's Journal of Record, Appendix 5: Timetable and Guidelines for Tenure and Promotion asks faculty to report on numerous areas which deal with teaching accomplishments in their tenure application as follows:

> **Teaching Accomplishments Since Initial Promotion or Appointment to Present Rank**
>
> **a. Courses taught at Fairfield University**
> Identify and describe courses developed or substantially redesigned, including new or existing courses designed for community engagement, and other substantial teaching activities that are counted as part of your assigned course load.
>
> **b. Teaching evaluation**
> > i. Peer review - The applicant is encouraged to request colleagues with firsthand experience of his/her teaching ability to submit written reports based on these observations. Colleagues may wish to address differences between their perceptions of candidate's teaching and student perceptions  if the student perceptions are known to the colleague.
> >
> > ii. Student Evaluation Summary - If student evaluations are submitted as supporting materials, a summary of the student rating must appear in this section of the

application. Sufficient information about the evaluation instrument (especially a department or personal form) and results must be provided to enable the committee to make an informed decision.

   iii.  Other - As appropriate, include community partner evaluations and community-based peer or student evaluations.

   iv.  Teaching Grants, Awards, or Citations.

**c. Description of involvement in curriculum development and enhancement.**

The candidate may include information about innovations in teaching and integrative approaches that bring together teaching, scholarship, and community engagement.

**d. Student advising.**

**e. Student supervision.**

Include activities such as independent studies, theses, academic student organizations, student teacher/clinical supervision, field trips, community-engaged projects/research, and the like.

**f. Participation in courses/seminars of other faculty.**

**g. Other community outreach teaching not counted as part of your teaching load.**

28. According to the Defendant's Journal of Record, Appendix 12: Guidelines for Faculty Annual Merit Review and Self-Evaluation, faculty members are expected to participate in an annual merit evaluation and self-assessment. There are three potential levels of merit for faculty: standard, additional (further merit level 1), and extraordinary (further merit level 2).

29. Defendant's Journal of Record, Appendix 12 further provides that faculty are assessed in the areas of teaching, scholarly/creative activity, and service. The scoring matrix for merit review is that a score of 0 in any of the three areas is considered adequate and meets the Standard Merit Level; a score of 1 is considered very good and meets the Further Merit Level 1; a score of 2 is extraordinary and meets Further Merit Level 2.

30. As defined in Appendix 12 the Defendant's Journal of Record, "Standard Merit requires sufficient achievements or activities in teaching and one other area. To earn Additional Merit, the faculty member must demonstrate achievements at the Additional level in two areas and the Standard level in the third area. Extraordinary Merit requires achievements at the Extraordinary level in one area and at the Additional level in the other two areas."

31. In 2010, Plaintiff received a merit review score of Further Merit Level 1, which indicated achievements and activities in teaching and scholarly/creative or service.

32. In 2011, Plaintiff received a merit review score of Standard, which by the Defendant's guidelines required achievements or activities in teaching by the Plaintiff.

33. Robbin Crabtree, Dean of Defendant's College of Arts & Sciences published a "Pre-Tenure Faculty Review: Requirements and Recommendations for Department Chairs" document which established the following annual review process.

✓ **Each year, as a matter of course, the Chair and at least one other tenured member of the department observe the pre-tenure colleague's classroom teaching.**

- All observations should be discussed with pre-tenure colleague, written up, and shared with the pre-tenure faculty member (letters *may* be copied to Chair)

- Discuss student evaluations, quantitative and qualitative, with pre-tenure faculty members annually.

  - *Additional department and outside faculty may also observe teaching.*

  - *Pre-tenure faculty members also should observe tenured colleagues teach.*

  - *Fall semester may be the best time for formal department classroom observations so that all materials can be assembled and reviewed by the department in February or March in time for annual review process.*

- All tenured members of the department should have conducted multiple visits and evaluations of each pre-tenure faculty member's teaching during the probationary period (this includes review of teaching materials, discussions of goals and pedagogies, and classroom observations).

  - *Work with the CAE to develop effective peer review of teaching practices.*

  - *Develop departmental cycles and routines for peer review of teaching.*

✓ **The Chair facilitates a departmental conversation about the pre-tenure colleague's progress in teaching, scholarship, and service.**

- Pre-tenure faculty member's annual report should be made available each year to all tenured faculty members for their review.

- Set aside one department meeting each March for this discussion.

11

- ○ Cull together comments and teaching observations to inform the Chair's letter.

    - *Chairs are encouraged gather comments from ID program directors and other colleagues at the university with whom the pre-tenure faculty member has had substantive professional engagement.*

    - *Departments may build consensus or vote on whether to recommend renewal of continuing contract; majority and minority opinions should be reported.*

- ✓ **The Chair must meet with the pre-tenure faculty member to discuss the report prior to her/his scheduled meeting with the Dean** (all meetings with the Dean are in April).

    - ○ Review expectations based on University and department standards; include reminders about contractual obligations (including meeting attendance).

    - ○ Listen to pre-tenure faculty member's self-assessment and reflections.

    - ○ Offer honest assessment of progress, areas for improvement, and other reflections.

    - ○ Chair must provide a copy of the letter to the pre-tenure faculty member *prior* to his or her scheduled meeting with the Dean.

        - *Chair should discuss contents of letter with pre-tenure faculty member face-to-face prior to her/his meeting with the Dean.*

        - *Pre-tenure faculty member may initiate such a meeting and should be given the opportunity to clarify or make factual corrections.*

34. Defendant's "Pre-Tenure Faculty Review: Requirements and

    Recommendations for Department Chairs" also provided that each annual

    review letter should advise Plaintiff regarding her progress towards tenure.  In

particular, the document states that the department should not recommend a

final contract after the 2nd or 3rd year when the fit and progress are insufficient.

- o In cases where suggestions for improvement and other expectations are not being met satisfactorily, annual review letters should include increasingly pointed language in each successive year.

  - *By the end of the third year on the tenure clock, the department should engage in a serious consideration of whether the pre-tenure faculty member is making adequate progress toward tenure and promotion to remain on the tenure track.*

  - *It is appropriate to make decisions during the probationary period based on specific attitudes or behaviors that affect job performance, productivity, and/or norms of civility and collegiality in the Academy and at Fairfield University.*

  - *It is usually best for an institution and for the pre-tenure faculty member to part ways in the 3rd or 4th year (i.e., recommend a terminal contract after the 2nd or 3rd year) in cases where progress and/or fit are not satisfactory.*

35. The Plaintiff received four successive reappointments to the faculty as an

Assistant Professor in a tenure track position between 2008 and 2012.

Plaintiff also served as Program Director for the Film, Television and Media

Arts Program in the College of Arts & Sciences in the Spring 2011 semester.

36. At each successive reappointment Plaintiff received the annual

evaluation/review from the chair of the Visual and Performing Arts Department.

37. During Plaintiff's employment with the Defendant, she was a key person in

developing new required courses and writing requirements, which added

challenging work for students who were Film majors.  In annual assessments

of Plaintiff, the Visual and Performing Arts Department advised that its

members expected Plaintiff to bring rigor and structure to the Film, Television and Arts Department.

38. Plaintiff's 2009 review was performed by Lynne Porter, Chair of Visual and Performing Arts who wrote by letter dated April 2, 2009 that, "[w]ith her arrival, the New Media faculty has started to formalize its procedures, and has started to meet regularly as a group. Not surprisingly, program-wide curricular changes are being discussed, and changes are underway. At her request, historically informal practices of the program are being formalized for students, with an eye toward greater transparency of process. She is also challenging students on racist, sexist, and homophobic choices in their filmmaking projects, and she hopes to bring greater levels of professionalism to the entire program." The letter concluded that, "Prof. Roxana Walker-Canton has had a good first year, and she is progressing well towards tenure and promotion."

39. Professor Porter's endorsement of Plaintiff was echoed in a supplemental evaluation letter by Robin Crabtree, Dean of the College of Arts & Sciences, dated April 24, 2009.

40. Plaintiff's 2010 evaluation was performed by Professor Porter who wrote by letter dated April 1, 2010 that, "We had a solid conclusion to the Mid-Probationary Review, when Prof. Chamlin told her that the VPA faculty has tremendous excitement for her knowledge and her expertise ... Prof. Roxana Walker-Canton has had a challenging second year, and if she addresses the concerns raised by the VPA faculty, she should be in good shape for her tenure application in 2011." Regarding the Plaintiff's teaching the letter states,

14

"The senior VPA faculty members have all visited Prof. Walker-Canton's classes this semester.  In general, the observations have been positive.  Most faculty members, myself included, have witnessed strong dynamics in her classroom.  The lessons are well-planned, the students respond to questions with a good grasp of the material, and the sessions have a nice combination of lecture, discussion, viewing media, and analysis."

41. In the supplemental evaluative letter by Dean Crabtree dated April 7, 2010, the letter concluded that, "Prof. Walker-Canton has already made significant contributions to the New Media program and its curriculum, and her teaching is as expected for a seasoned instructor."  Dean Crabtree echoed the continuing expectation that Plaintiff bring rigor to the program in the letter stating that, "[T]hey [senior VPA faculty] also encourage Prof. Walker-Canton to continue to challenge what they see as a lackadaisical attitude among many students in the film/TV courses."

42. Plaintiff's 2011 evaluation was performed by Brian Torff, Temporary Chair of Visual and Performing Arts by letter dated March 14, 2011.  In the letter Professor Torff stated that, "Overall: Dr. Walker-Canton is facing the challenges of being program director well.  I endorse Dr. Walker-Canton's efforts in the areas of service, teaching, and her scholarly work."  The evaluation also observed that, "In viewing her March 2nd, 2011 TL230 Remote TV Production class, I found that "Her class discussion was thought-provoking due to her asking probing questions of the students."

43. In the Spring 2011 academic semester, Plaintiff co-taught TA 233 Acting for the Camera with Professor Mariah Sage, a white female, but because of problems coordinating the classes, in April 2011 Professor Sage and Plaintiff agreed to not hold classes together.  Plaintiff emailed Brian Torff, then Acting Chair of the Visual and Performing Arts Department to notify him of the change.  Professor Torff sent Plaintiff's email to the entire Visual and Performing Arts Department, who then used the incident to blame Plaintiff for the failure of the team-teaching effort, instead of the white female, and to paint the Plaintiff as unprofessional in subsequent evaluations, despite never having asked to meet with the Plaintiff or discuss the class with her.

44. After Professor Torff sent Plaintiff's email to the entire Visual and Performing Arts Department faculty the Department's faculty began deviating from their stated expectations for Plaintiff to secure tenure.

45. Professor Torff then performed a markedly different evaluation of Plaintiff by letter dated in May 2, 2011 after four Visual and Performing Arts Department faculty members voted against Plaintiff's contract renewal.  In assessing Plaintiff's teaching, the letter stated that Plaintiff's teaching was positive and cited several professors who observed and praised Plaintiff's teaching.

46. In this letter, Professor Torff raised the problem that Plaintiff's classes were under enrolled for the first time, without any acknowledgement that the expectation that Plaintiff bring academic rigor and structure to a program, as demanded by her colleagues as a condition of employment, would naturally result in fewer students opting to take Plaintiff's classes.  The letter did not

acknowledge that Reverend James Mayzik, S.J., Associate Professor of Visual and Performing Arts purposefully allowed students to over-enroll in his courses so there would be fewer students left to enroll in Plaintiff's classes. The letter also raised the issue of Plaintiff's punctuality for the first time stating, "My VPA colleagues have continually raised punctuality as an issue. It is our expectation that Professor Walker-Canton arrive on time to class."

47. Professor Torff's letter concluded by also raising collegiality as an issue for first time, stating that, "It is the expectation and hope of the Visual and Performing Arts tenured faculty that should Professor Walker-Canton be granted renewal of a continuing contract for 2011-12, that she completely and demonstrably develop a more collegial manner ... This is essential to her future at Fairfield University, the success of the New Media program and the Department of Visual and Performing Arts. We are all hopeful that this will be a turning point and look forward to positive change."

48. In a supplemental letter dated May 2, 2011, Dean Crabtree addressed faculty concerns stating, "I subsequently met with Profs. Torff and Porter (who will resume her chair term next year) along with Prof. Walker-Canton to discuss the departmental concerns. First, I noted that mutual assessment of an untenured colleagues' fit with a program culture and its standards of performance is an appropriate and necessary feature of the probationary years. Second, I communicated my hope that the department would be open to Prof. Walker-Canton's efforts to address their concerns and give her genuine opportunities to overcome their negative perceptions in the coming

17

year … Given noteworthy contribution in all three areas [teaching, scholarship, and service], and with hopes that the conflicts will subside through shared effort and that Prof. Walker-Canton will work to successfully address departmental concerns, I recommend renewal of a continuing contract this year."

49. Dean Crabtree's 2011 supplemental letter recognized student resistance to Plaintiff's efforts to structure the academic programming in the Film, Television & Media Arts Program, noting that, "In her capstone course, she added annotated bibliographies and research papers to what has been, in the past, a course focused almost exclusively on production, and one I also had recommended during the 5-year review process.  She found that students have resisted this change and consequently, registration enrollments in her subsequent capstone sections reflect this resistance."

50. Dean Crabtree's letter also noted that, "Concerns have also been noted by her colleagues about regular tardiness to class, apparent disorganization or lack of preparation, and the need to develop better rapport with the students in the program; these concerns seem to be consistent with student responses from spring 2010."

51. In October 20, 2011 Professor David Gudelunas, Associate Professor and Chair of the Department of Communication in the College of Arts & Sciences, submitted a pre-tenure annual review letter in support of Plaintiff's application for tenure and concluded that, "Roxanna is a wonderful asset to both the New Media Program as well as the Women's Studies program.  I enjoyed

18

Roxanna's class as much as I enjoy her warm collegiality in helping coordinate the program in Women's studies … I truly believe she has found her niche at Fairfield."

52. At the time of plaintiff's fourth reappointment in 2012, Professor Porter submitted an annual review letter for the Plaintiff dated April 4, 2012.  In the letter, Professor Porter stated that, "In general, various VPA colleagues have noticed an improvement in Prof. Walker-Canton's professional comportment in relation to departmental norms for collegiality and engagement in department operations.  She is apparently taking our constructive feedback to heart.  This is a positive dynamic, and we are pleased and encouraged.  A number of VPA colleagues and I have visited Prof. Walker-Canton's classes this year, and everyone reports markedly better class sessions than in previous years.  The classes are well organized, with a nice variety of activities … We are glad to see the improvement over class visits in previous years, and encourage Prof. Walker-Canton to continue in this direction."

53. Professor Porter's letter also noted that, "Prof. Scalese noted three instances during this spring 2012 semester in which she was late for her Senior Capstone class."  The evaluation does not mention whether Professor Scalese confirmed with Plaintiff that she was indeed late and if so, the reason why.  In a letter dated August 17, 2012 Rev. Mark Scalese provides feedback to the Plaintiff on her performance and never raises the issue of tardiness.

54. Professor Porter's evaluative letter again critiques the Plaintiff on her relationships with students, stating, "While she is teaching the daily material of

19

the classes, using appropriate methods, a crucial piece seems to be missing: a basic interpersonal connection." The evaluation does not mention that Plaintiff invited Film, Television & Media Arts Program student to her home for dinner during the Fall 2011 semester and advised 20-25 students per semester.

55. Professor Porter's letter concludes by stating that "The senior VPA faculty unanimously requests that Prof. Walker-Canton ask to have the one year of previous teaching credit removed from her tenure clock, so she can wait to apply for tenure and promotion until 2013. This will allow her another year to demonstrate significant progress in relation to areas of expressed concerns by the department, especially in the area of teaching."

56. Dean Crabtree wrote a supplemental letter to Lynne Porter's annual review in which she affirmed the VPA department's request and concerns. The letter notes that Plaintiff had the right to proceed according to the clock negotiated at the time of her hire. The letter recommended renewing the continuing contract.

57. Dean Crabtree's letter also critiqued over reliance on student evaluations to assess the Plaintiff stating that, "I also am concerned about this [low response rate for student evaluations] for all pre-tenure faculty as small sample sizes make data volatile and statistically invalid, as the FEDC warned us (also a single student or two can skew the averages)."

58. In a letter dated August 17, 2012 Rev. Mark Scalese, Associate Professor in the Film, Television and Arts Program provided feedback to Plaintiff as requested by Dean Crabtree, which stated that, "I think that you are in a good

20

position to apply for tenure and promotion in the fall ... You also bring a cordial, collegial presence to our New Media faculty meetings... you have consistently encouraged our program to be more collegial and transparent in its decision-making, more open to diversity in its course offerings and dealings with students ... In our one-on-one conversations this past semester, your care and concern for our students has become increasingly clear to me." The letter closes with, "rest assured that I WILL be supportive of you and your case." Nowhere in the letter is tardiness mentioned by Rev. Scalese.

59. Plaintiff applied for promotion to Associate Professor and tenure on September 17, 2012 pursuant to the requirements in Appendix 5 of Defendant's Journal of Record, which establishes a timetable and guidelines for the dossier that is to be submitted for the tenure application.

60. The plaintiff more than met the conditions and concerns as outlined in Lynne Porter's letter. Nevertheless, the VPA department did not support Plaintiff's application for tenure.

61. On or about January 2013, Plaintiff was informed that she had been denied tenure and promotion to the rank of Associate Professor.

62. After receiving notification of the denial of tenure, Plaintiff met with Paul Fitzgerald, Vice President of Academic Affairs, and Robin Crabtree, Dean of Arts and Sciences, separately, for clarification on why Plaintiff did not receive tenure.

63. In Plaintiff's meeting with Mr. Fitzgerald, he stated that Plaintiff did not receive tenure because student evaluations stated that Plaintiff was late to class,

disorganized and handed work back late. When Plaintiff asked him for this feedback in writing so that she would be clear about what she needed to appeal, he told her that he would not provide a written summary of the committee's reasons for denying her a recommendation of tenure.

64. In Plaintiff's meeting with Dean Crabtree in Spring 2013, she stated to Plaintiff that the reasons given by Mr. Fitzgerald were not legitimate reasons to deny tenure.

65. On or about March 2013, Plaintiff filed an appeal of the denial of tenure.

66. On or about March 25, 2013, Plaintiff received notice that her denial of tenure was affirmed.

67. On or about May 10, 2013, Plaintiff received a terse explanation of denial of tenure, stating that "[t]he rank and tenure committee found, upon review of your dossier, supporting materials, and letters of evaluation by peers, that there was insufficient evidence of continuing professional accomplishments in the area of teaching to merit tenure and promotion."

68. As an Assistant Professor in the Film, Television and Media Arts Program the Plaintiff reasonably expected that members in the Visual and Performing Arts Department or College of Arts & Sciences would define "appropriate faculty" in adequate detail as required in the Defendant's Faculty Handbook § II.A.1.a. Absent a specific communication to the contrary, Plaintiff reasonably expected that the members of her department would have consistent expectations and would not expect her to meet standards not communicated to her. Rather, the Plaintiff reasonably expected that the Visual and Performing Arts Department

22

would establish a clear definition of "appropriate faculty" that would apply clearly and consistently to all faculty within the Film, Television and Media Arts Program.

69. Contrary to Plaintiff's reasonable expectation, the Visual and Performing Arts Department did not establish a clear definition of "appropriate faculty." Further, the Visual and Performing Arts Department did not apply a consistent standard that was clearly communicated to Plaintiff.

70. Plaintiff reasonably expected Defendant to rely upon policies established in Defendant's Faculty Handbook and Journal of Record in evaluating Plaintiff's application for tenure.

71. Despite asking Plaintiff to report on numerous areas related to teaching accomplishments as one of the three areas that Plaintiff would be evaluated on for tenure (teaching, recognized professional competence, and professional services) in accordance with Defendant's Faculty Handbook Section § II.2.b, the Defendant relied upon a subset of one out of the seven areas related to teaching as the basis to deny Plaintiff tenure.

72. Defendant's reasoning in denying Plaintiff tenure did not take into consideration the limits of reliance on student evaluations which was noted by Dean Crabtree in her April 29, 2012 supplemental evaluation letter for Plaintiff which stated, "I also am concerned about this [low response rate for student evaluations] for all pre-tenure faculty as small sample sizes make data volatile and statistically invalid, as the FEDC warned us (also a single student or two can skew the averages)."

23

73. According to the Defendant's student evaluations, out of the 188 students that Plaintiff taught in six courses between 2009 and 2012, only 7 students noted tardiness as a problem, 11 noted timeliness in returning work as a problem and 22 noted disorganization as a problem. Furthermore, nearly all of these comments pre-dated the VPA department's criticism and the acknowledgement in 2012 that Plaintiff had improved. Indeed, following the April 2012 letters there were no student complaints of tardiness, only two students noted delayed return of work and six students made comments regarding organization.

74. Defendant's reasoning to deny Plaintiff tenure also did not take into consideration that the small number of negative student evaluations are a natural outcome of the academic rigor and structure that Plaintiff was expected to bring to the Film, Television and Media Studies Program. Defendant brought Plaintiff onto the faculty to perform a task that was naturally disliked by students and then used the negative student evaluations as a basis to deny her tenure. This problem of student feelings towards Plaintiff was noted by Dean Crabtree, who in her April 29, 2012 supplemental letter stated that, "Prof. Walker-Canton convinced her colleagues in New Media to increase expectations in the [senior] capstone, requiring formal research (on film theory and related to the students' film projects), an annotated bibliography, and oral presentations, in addition to the film itself. She noted that students don't seem to be responding well to these new expectations (which not have been

adopted for all sections of capstone, not just hers), complaining that they are a distraction from their work on the film project itself."

75. Defendant's reasoning for denial of tenure directly conflicts with evaluations of Plaintiff's classes, including the April 4, 2012 annual evaluation letter submitted by Professor Porter, which states "A number of VPA colleagues and I have visited Prof. Walker-Canton's classes this year, and everyone reports markedly better class sessions than in previous years.  The classes are well organized, with a nice variety of activities."

## COUNT ONE:   NEGLIGENT MISREPRESENTATION

1-75      Paragraphs one through seventy-five are incorporated by reference and made paragraphs one through seventy-five of Count One as though more fully set forth herein.

76. Defendant failed to exercise due care in obtaining and communicating information to the Plaintiff regarding the standards applicable to the tenure decision, including, but not limited to the standard of teaching effectiveness sufficient for promotion and tenure along with an evaluation of Plaintiff's performance against that standard.

77. Plaintiff relied upon her continued reappointment and the communications and advice she was given regarding her teaching and the tenure decision and conformed her conduct to the information she received.  Despite being advised that any issue with teaching effectiveness had been addressed, Defendant relied upon evaluations that pre-dated such criticisms to deny Plaintiff tenure even though the same departmental members recommended her for reappointment to tenure track on the same evidence, contrary to established

rules stating a positive recommendation should not be made under such circumstances.

78. As a result of Defendant's negligent misrepresentation, Plaintiff was denied tenure and had suffered damages including the loss of wages and benefits, emotional distress, loss of enjoyment of life, the destruction of her career in academia and harm to her reputation as a film maker.

## COUNT TWO:   BREACH OF CONTRACT

1-75      Paragraphs one through seventy-five are incorporated by reference and made paragraphs one through seventy-five of Count Two as though more fully set forth herein.

76. The defendant has breached the employment agreement between Fairfield University and the Plaintiff, including the implied covenant of good faith and fair dealing, by refusing to consistently comply with the Defendant's Journal of Record and Faculty Manual which provides the procedural and substantive requirements for tenure.

77. Furthermore, the Defendant breached the implied covenant of good faith and fair dealing required that neither party would act to defeat the reasonable expectations of the other party, but that each party would deal honestly and faithfully to adhere to the principle that tenure should be granted if Plaintiff objectively met the Defendant's standards for tenure as communicated to Plaintiff in the Faculty Handbook, Journal of Record, "Pre-Tenure Faculty Review: Requirements and Recommendations for Department Chairs", annual tenure track evaluations, and other oral and written communications between Plaintiff and Defendant.

78. Contrary to Plaintiff's reasonable expectations, the procedures set forth in Defendant's Journal of Record, Faculty Handbook and "Pre-Tenure Faculty Review: Requirements and Recommendations for Department Chairs" were not followed in that: (1) the Visual and Performing Arts Department and the College of Arts and Sciences failed to clearly define and hold all faculty in the Film, Television and Media Arts Program to the same standard for promotion to tenure; (2) the Visual and Performing Arts Department failed to establish a definition of "appropriate faculty" that was consistently and clearly communicated and applied to Plaintiff; (3) the Visual and Performing Arts Department consistently changed the expectations for Plaintiff during the probationary period; (4) the Defendant did not notify the Plaintiff in her final annual evaluation, as required in "Pre-Tenure Faculty Review: Requirements and Recommendations for Department Chairs" that there were concerns with her teaching sufficient to deny her tenure, rather Defendant express satisfaction with Plaintiff's teaching; and (5) Defendant repeatedly deviated from their stated expectations of Plaintiff for her to acquire tenure' (6) Defendant continued to reappoint her after Plaintiff had attended to teaching criticism and then used the same issues to deny Plaintiff tenure when the rules required the department not to recommend Plaintiff's continued employment. As such, Defendant also acted arbitrarily, capriciously and in bad faith regarding denial of a recommendation for tenure based on alleged issues with teaching.

27

79. As result of Defendant's breach of the employment agreement regarding tenure, Plaintiff has sustained damages including, but not limited to, the difference in wages between what she is now earning and what she would have earned had Fairfield granted her tenure, loss of enjoyment of life, and the loss of all benefits associated with tenured status at Fairfield University.

**COUNT THREE:     DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000e *et seq.***

1-75     Paragraphs one through seventy-five are incorporated by reference and made paragraphs one through seventy-five of Count Three as though more fully set forth herein.

76. The racial and gender  animus certain members of the Visual and Performing Arts Department harbored towards Plaintiff influenced the denial of tenure and was displayed in the denial of tenure based upon conflicting reasoning and the failure to adhere to the procedures provided for tenure decision-making process. Plaintiff, the only person of color employed on tenure track or tenured in the VPA department, was also held to a higher standard than similarly situated white males.

77. At the time the Plaintiff began her employment with the Defendant, the Film, Television & Media Arts Program comprised of two full time faculty members who are white males - Reverend Mark Scalese, S.J., Associate Professor of Visual and Performing Arts and Reverend James Mayzik, S.J., Associate Professor of Visual and Performing Arts.  Rev. Scalese attained tenure in 2010 and Rev. Mayzik attained tenure in 2011.

78. During the period of Plaintiff's employment with the Defendant, she was subjected to harsher and continually changing standards for attaining tenure and was treated differently than Rev. Scalese and Rev. Mayzik.

79. Rev. Mayzik was a full time faculty member at Fairfield University since 1994 and was not granted tenure until 2011, which violates Defendant's policy in Faculty Handbook, §II.A.3.c.(1), establishing that the maximum probationary period of time full-time teaching at Fairfield University without application to tenure is seven years.  Defendant's policies do not allow for stopping the clock or postponing a decision regarding promotion and/or tenure.

80. Rev. Mayzik was denied a recommendation of tenure by the VPA faculty and granted tenure by Defendant.  This was in spite of VPA faculty concerns that Rev. Mayzik's teaching quality was poor and did not include sufficient amounts of reading, writing, reflection or critical thinking.  For example, Rev. Mayzik would teach classes with adjunct professors, even though the classes were not advertised as joint teaching classes.  In these classes, Rev. Mayzik and the adjunct professor would argue about key concepts which would confuse students.  Moreover, Rev. Mayzik would purposefully violate course enrollment limits and over enroll students in his class to make it appear that his classes were more popular.

81. During the period of Plaintiff's employment with the Defendant, she was subjected to gender and racial bias.

82. Plaintiff was the co-organizer of "Reel Women", between 2010 and 2014, a program which sponsored seven different presentations by filmmakers and

scholars focused on the issue of gender in the field of film.  Despite being invited to and in at least five instances being reminded several times and implored to attend, no Visual and Performing Arts Department faculty attended any of these events demonstrating that Plaintiff was not welcomed in the department.

83. In 2008, when Plaintiff began working for the Defendant she was placed in a physically insecure office without a functioning door.  In contrast, both Rev. Mayzik and Rev. Scalese, who were also pre-tenure faculty in the Film, Television & Media Arts Program in 2008 had offices with functioning doors in Xavier Hall, which housed the Film, Television & Media Arts Program.  When Plaintiff complained about her inadequate office space, she was moved to Donnarumma Hall, across the campus.  In the meantime, as office space became available Xavier Hall it was given to recent students who graduated and worked in the Media Center, instead of Plaintiff.

84. Members of the Visual and Performing Arts faculty then began to use Plaintiff's lack of a physical presence in the Media center against her in evaluations, despite the fact her assigned office was in a separate building, which was out of her control.  In an April 4, 2012 annual assessment of Plaintiff, Professor Lynne Porter, Chair of the Visual and Performing Arts Department stated, "The senior VPA faculty is convinced that a great part of this dynamic [lack of mentoring of students by Plaintiff] is the fact that she is not physically present.  She is only in the Media Center when she is teaching a scheduled class, so she does not maintain a presence in and around the various labs and studios."

85. In March 2011, Plaintiff made a research presentation of her work and organized a film series in honor of black history month and women's history month, no full time faculty members within the Visual and performing Arts Department or Film, Television & Media Studies Program attended further demonstrating that Plaintiff was not welcomed in the department.

86. In contrast, in Spring 2010, an adjunct professor in the Art History program in Defendant's Visual and Performing Arts Department, Victor Dupei, a white male, gave a scholarly talk on Italian architecture in the same location. There were several Visual and Performing Arts Department faculty in attendance.

87. During the Spring 2011 academic semester, despite being pre-tenure faculty, Plaintiff was assigned to serve as Program Director of the Film, Television & Visual Arts Program due to existing tenured faculty in the Program taking a leave of absence. No one within the Visual and Performing Arts Department offered to serve as Program Director of the Program. In contrast, when the Theater Program within the Visual and Performing Arts Department required a Program Director, rather than have pre-tenure faculty member Professor Sage, a white female, serve as Program Director, Professor Porter, Chair of the Visual and Performing Arts Department stepped down as Chair of the Department to temporarily serve as Program Director of the Theater Department.

88. In a subsequent lunch in the Faculty Commons with Professor Sage to discuss their relationship following the separation of the two courses that had been team taught, Professor Sage, a white female who was favored by the white members of the VPA department and therefore suffered no criticism for the failure of the

31

team-teaching experiment, unlike Plaintiff whose was then accused of lack of collegiality, stated to Plaintiff that maybe "where you come from" and the people Plaintiff communicates with work like this and talk like this, but Professor Sage didn't work or talk like Plaintiff.  Professor Sage also stated that she felt unsafe around Plaintiff, without any explanation for why she felt unsafe at a public lunch.

89. Professor Sage's comments at lunch reflected and the ways in which the VPA department failed to support and ostracized Plaintiff demonstrate the view of the members of the VPA department that Plaintiff was different and an outsider based on her race.

90. Plaintiff also was the recipient of sexist language by co-workers within the Film, Television & Media Program.  In a meeting with Plaintiff Rev. Scalese complained to her that he did not understand how she could fail to make the students feel as if she "cares" about them since he has seen what a wonderful mother she is to her own children.

91. Rev. Mayzik in the Film, Television & Media Program also encouraged students and adjunct professors to repeatedly undermine Plaintiff's status as a full-time tenure track professor.

92. Rev. Mayzik was director of Defendant's Media Center for several years and during that time period he would designate students and staff teach courses on equipment who would review Plaintiff's student's coursework and provide conflicting feedback which caused confusion among students on the appropriate standards for their coursework.

93. Rev. Mayzik allowed his production students to take out equipment from the Media Center while he required Plaintiff's production students to show him their proposal or script before he allowed them to take out equipment.

94. Rev. Mayzik provided keys to students to doors in the Media Center building that Plaintiff did not have keys or access to.

95. Defendant also encouraged a culture that lacked diversity. The entry point to the main hall where Film, Television & Media Program classes were held displayed overwhelmingly white film representations and a statute of a nude male. When Plaintiff requested that the Defendant consider displaying more diverse film representations, her request was ignored.

96. In denying tenure and promotion to Plaintiff, Defendant rejected Plaintiff because of her diverse views and background that was not similar to or shared by the all white faculty members of the VPA department, and held Plaintiff to a higher standard than similarly situated tenure track employees, including the white male members of her own department that were granted tenure.

97. Based on the foregoing, Defendant discriminated against Plaintiff on the basis of race and gender in the terms and conditions of her employment, including the denial of tenure and promotion resulting in the termination of Plaintiff's employment, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

98. Defendant's actions were intentional in that they were willful, wanton, and taken with reckless disregard of Plaintiff's rights.

99. As a result of Defendant's discriminatory actions, Plaintiff has suffered damages, including, but not limited to, economic and non-economic damages in the form of loss of wages and benefits, emotional distress, loss of enjoyment of life and profession, and harm to reputation.

100.     As a further result of Defendant's discriminatory conduct, Plaintiff has incurred, and will continue to incur, attorney's fees and costs.

## COUNT FOUR: DISCRIMINATION IN VIOLATION OF THE CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT, CONN. GEN. STAT. § 46a-60 *et seq.*

1-96     Paragraphs one through ninety-six of Count Three are incorporated by reference and made paragraphs one through ninety-six of Count Four as though more fully set forth herein.

97. Based on the foregoing, Defendant discriminated against Plaintiff on the basis of race and gender in the terms and conditions of her employment, including the denial of tenure and promotion resulting in the termination of Plaintiff's employment, in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 et seq.

98. Defendant's actions were intentional in that they were willful, wanton, and taken with reckless disregard of Plaintiff's rights.

99. As a result of Defendant's discriminatory actions, Plaintiff has suffered damages, including, but not limited to, economic and non-economic damages in the form of loss of wages and benefits, emotional distress, loss of enjoyment of life and profession, and harm to reputation.

100.     As a further result of Defendant's discriminatory conduct, Plaintiff has incurred, and will continue to incur, attorney's fees and costs.

## DEMAND FOR RELIEF

**WHEREFORE**, the plaintiff demands a TRIAL BY JURY and judgment against the Defendant as follows:

1. An order reinstating the plaintiff to a position as Associate Professor of Film, Television and Media Arts with tenure and awarding her the salary and benefits she would have received had she been granted promotion and tenure in 2013 together with interest;

2. Economic damages including lost wages and benefits

3. Non-economic damages, but not limited to, damages for emotional distress, pain, humiliation and embarrassment, loss of enjoyment of life, loss of enjoyment of profession, and harm to reputation.

4. Punitive damages pursuant to 42 U.S.C. § 1981a and Connecticut General Statutes § 46a-104 as "legal relief";

5. Interest;

6. Attorney's fees and litigation costs, 42 U.S.C. § 2000e-5 and 42 U.S.C. § 1988, and Connecticut General Statutes § 46a-104

7. Such other further monetary or injunctive relief as this Court deems necessary and proper.

Dated at New London, Connecticut this 15th day of September, 2014

PLAINTIFF
ROXANA WALKER-CANTON

By: _____

Jacques J. Parenteau (ct09771)
Madsen Prestley & Parenteau, LLC
105 Huntington Street
New London, CT 06320
Tel: (860) 442-2466
Fax: (860) 447-9206
Email: jparenteau@mppjustice.com